**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

_____

|  |  |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | : : : : |
| **Plaintiff,** | : : |
| **v.** | : **Civil Action No.** : : |
| **JAMES N. FRY, MICHELLE W. PALM, and ARROWHEAD CAPITAL MANAGEMENT LLC,** | : : : : |
| **Defendants.** | : : |

_____ :

## <u>COMPLAINT</u>

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges:

### NATURE OF ACTION

1.      This is a securities fraud case concerning investment fund managers who funneled approximately $600 million of their clients' money into a multi-billion dollar Ponzi scheme perpetrated by Thomas J. Petters ("Petters").

2.      From as early as 1995 through September 2008, Petters ran a massive Ponzi scheme through the sale of promissory notes (the "Notes") to investors.  Petters, a prominent Minnesota businessman who controlled an empire of companies, promised investors that proceeds from the Notes would finance the purchase of vast amounts of consumer electronics by certain vendors. The vendors would then resell the merchandise to certain "Big Box" retailers (the "Retailers"), including such well-known chains as Sam's Club and BJ's Wholesale Club.  Over the years, Petters raised billions through the sale of the Notes.

3.     But, in reality, there were no purchases and sales of consumer electronics. The vendors were shell companies acting in concert with Petters and no Retailers participated in the purported transactions. Instead, Petters diverted billions of dollars to his own purposes and paid purported profits to investors with money raised from the sales of new Notes to new and existing investors. Petters's purported inventory finance operation was nothing but a massive Ponzi scheme.

4.     Petters raised much of his money by selling the Notes to several large funds. Among the funds that bought Notes from Petters were three funds controlled by Defendants James N. Fry ("Fry"), Michelle W. Palm ("Palm"), and Fry's investment management firm, Arrowhead Capital Management LLC ("Arrowhead LLC") (collectively, the "Defendants"). The three funds are: Arrowhead Capital Finance Ltd. ("Arrowhead Finance"), Arrowhead Capital Partners II L.P. ("Arrowhead Partners"), and Elistone Fund ("Elistone") (collectively, the "Funds"). When used in the Complaint, the term "Defendants" is, unless otherwise indicated, meant to include Fry at all times and Arrowhead LLC at all times, and Palm during the time she was employed by Arrowhead LLC.

5.     From 1998 through 2008, the Defendants funneled money into the Petters Ponzi scheme by selling interests in the Funds to investors. Investors in the Funds included both institutions and individuals. The Funds invested virtually all investor contributions in the Petters Ponzi scheme.

6.     During the same period, Fry and Arrowhead LLC earned more than $42 million in fees under their agreements with the Funds. Fry and Palm were paid salaries and other compensation from money invested in the Funds.

7.     In the course of operating the Funds, Defendants misrepresented (and aided and abetted Arrowhead Partners in misrepresenting) numerous material facts regarding the Funds, including misrepresentations relating to:  (1) how money flowed from the Retailers to the Funds; (2) Arrowhead LLC's registration status with the Commission; and (3) the existence of quarterly examinations of the transaction procedures by independent accountants.  With respect to the flow of funds, the Defendants misrepresented (and aided and abetted Arrowhead Partners in misrepresenting) the safeguards purportedly provided by certain bank accounts (the "Collateral Accounts") held by the Funds.  The Defendants and the Funds informed investors that they would use funds from the Collateral Accounts to pay the purchase price for Notes directly to vendors; and subsequently, money for the repayment of Notes would be paid into the Collateral Accounts directly from the Retailers.  This arrangement purported to protect investors inasmuch as proceeds from the Notes would not be paid to Petters and the role of the Retailers in each transaction would ostensibly be verified by the direct, transparent receipt of their payments into the Collateral Accounts.  This arrangement was especially important given that the Defendants did not inspect the merchandise collateralizing the Notes.  But, in reality, the Retailers made no payments into the Collateral Accounts; rather, the money used for the repayment of Notes held by the Funds always came directly from Petters and the Defendants knew it.  Neither Defendants nor the Funds disclosed this material fact to investors; instead, they continued to disseminate the false representations regarding the Collateral Accounts to investors and prospective investors.

8.     While assuring investors that the Funds completed "rigorous due diligence" and employed a "robust risk management structure," Fry and Arrowhead LLC also failed to disclose (and aided and abetted Arrowhead Parnters's failure to disclose) their discovery of the serious

criminal record of Frank Vennes ("Vennes"), a key associate of Petters who served as Petters's liaison with the Defendants.

9. Finally, beginning in late 2007, Petters had difficulties obtaining enough cash from new investments to make timely payments on outstanding Notes. As a result, Petters was late making payments on some of the Notes held by Arrowhead Finance and Arrowhead Partners. Nevertheless, the Defendants concealed (and aided and abetted Arrowhead Partners's efforts to conceal) Petters's difficulties in making payments, even as they continued to solicit new investments for the funds. Even worse, the Defendants ultimately decided to extend the maturity dates of those Notes headed for default to hide the fact that they were paying late.

10. As a result of the foregoing, the Defendants have violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77(q)(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5 ] thereunder, and Section 206(4) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. § 80b-6(4)] and Rule 206-4(8) [17 C.F.R. § 275.206-4(8)] thereunder.

11. The Commission brings this lawsuit to hold the Defendants accountable for their flagrant and repeated violations of the federal securities laws and to prevent further harm to investors.

## DEFENDANTS

12. <u>Arrowhead Capital Management LLC</u>, headquartered in Minnesota, is an unregistered investment advisor organized under the laws of Minnesota on January 10, 2003. Arrowhead LLC is the General Partner to Arrowhead Partners. In that capacity, it managed and was responsible for the operation of Arrowhead Partners and its investments. Arrowhead LLC

also served as a consultant to Arrowhead Finance.  In that capacity, Arrowhead LLC presented prospective trade finance transactions to Arrowhead Finance's investment manager. Additionally, Arrowhead LLC served as an investment advisor and master servicer to Elistone. In that capacity, Arrowhead LLC presented prospective trade finance transactions to Elistone's investment manager.

13.     James N. Fry resides in Minnesota.  Fry was the founder and President of Arrowhead Capital Management Corporation ("Arrowhead Corp."), the predecessor to Arrowhead LLC, and is the founder and Chief Manager of Arrowhead LLC.  As the President of Arrowhead Corp. and the Chief Manager of Arrowhead LLC, Fry was responsible for both firms' operations, including investments made by Arrowhead Partners.  As its portfolio manager, Fry was also responsible for investment decisions made by Arrowhead Finance.  In those positions, Fry signed transaction documents for the Notes held by Arrowhead Partners and Arrowhead Finance, including documents directing the transfer of funds and a document extending the maturity date of one Note.  Fry also solicited investments for both Arrowhead Partners and Arrowhead Finance.  On July 19, 2011, the United States Attorney's Office for the District of Minnesota ("USAO") obtained an indictment against Fry for making false statements to the Commission in connection with the acts alleged in this complaint, securities fraud, and wire fraud.  Fry pleaded not guilty on July 26, 2011; his trial is scheduled for February 2012.

14.     Michelle W. Palm resides in Minnesota.  Arrowhead LLC employed Palm from September 2007 through August 2009.  From approximately February or March 2008 until the end of her employment, Palm held the title of Managing Director – Finance.  In that position, Palm oversaw the day-to-day operations of the Funds.  In 2008, Palm was essentially "second in command" at Arrowhead LLC behind Fry.  While employed by Arrowhead LLC, Palm signed or

initialed transaction documents for the Notes held by the Funds, including documents directing the transfer of funds. Additionally, Palm solicited investments for Arrowhead Partners and served as Arrowhead LLC's relationship manager and primary point of contact with respect to Elistone. On April 5, 2011, the USAO filed a criminal information against Palm for securities fraud and making false statements to the Commission in connection with the acts alleged in this complaint. Palm pleaded guilty on April 8, 2011.

## OTHER RELATED PARTIES

15. Thomas J. Petters is currently serving a 50-year prison sentence for mail and wire fraud in connection with the sale of securities. In 1988, Petters founded what became Petters Company Inc. ("PCI"), which purported to finance the fictitious inventory transactions alleged in this complaint. Petters began selling merchandise online in 1998 and, in 2001, jointly with a direct mail merchandiser. He managed all of his businesses under the umbrella company Petters Group Worldwide LLC ("Petters Group").

16. Petters Company Inc. was founded by Petters and organized under the laws of Minnesota. Petters used PCI to sell the Notes that were at the core of his Ponzi scheme.

17. Petters Group Worldwide LLC, headquartered in Minnesota, is the umbrella company through which Petters oversaw the diversified group of approximately 60 companies in which he invested funds derived from his Ponzi scheme.

18. Arrowhead Capital Finance Ltd. was an exempted mutual fund company with limited liability organized under the laws of Bermuda on October 30, 1998. Over the life of Arrowhead Finance – save for a short period during which it invested with other inventory brokers and wholesalers – 80% to 100% of its investments were Notes. Arrowhead Finance purchased all but two or three Notes out of over 1,000 total Notes that Arrowhead LLC presented

to it as investment opportunities. From 1999 to August 31, 2008, Defendants raised over $380,000,000 from investors for investments in Arrowhead Finance. In addition, Arrowhead Finance issued over $33 million in subordinated debt instruments as credit support for its Notes. Arrowhead Finance used the proceeds of certain of those subordinated notes to purchase additional Notes. Arrowhead Finance is currently in liquidation.

19.     Arrowhead Capital Partners II L.P. is a limited partnership organized under the laws of Delaware on May 14, 2001. Arrowhead Partners's only investments were Notes. From 2001 to August 31, 2008, investors contributed over $133,000,000 to Arrowhead Partners.

20.     Elistone Fund is an exempted company with limited liability organized under the laws of the Cayman Islands on January 18, 2008. All of Elistone's investments were Notes. In 2008, investors contributed over $37,000,000 to Elistone.

21.     Arrowhead Capital Management Corporation, the predecessor to Arrowhead LLC, was organized under the laws of Delaware on October 24, 1995 and was the General Partner to Arrowhead Partners.

22.     Blue Point Management Ltd. ("Blue Point") is an exempted company and an unregistered investment adviser organized under the laws of Bermuda. Blue Point managed Arrowhead Finance. In that capacity, it was responsible for the operation of the fund and its investments. Fry was the founder, the President, and a Director of Blue Point.

23.     Integrated Alternative Investments Limited ("Integrated") is a company organized under the laws of the United Kingdom on June 5, 2000. Integrated managed Elistone.

24.     Frank E. Vennes, Jr. was a broker for several firms that invested with Petters and, in that role, earned at least tens of millions of dollars in commissions for delivering investors to Petters. Vennes served as an intermediary between Petters and Arrowhead LLC. As an

intermediary, Vennes informed Arrowhead LLC when Notes were about to be repaid and presented Arrowhead LLC with new investment opportunities for Arrowhead Partners and Arrowhead Finance.  In his role as an intermediary between Petters and Arrowhead LLC, Vennes controlled the flow of information between Petters and Arrowhead LLC.  In 1987, Vennes pleaded guilty to federal money laundering charges and entered a plea of nolo contendere to charges related to the illegal sale of a firearm and the use of a telephone to facilitate the distribution of cocaine; he was sentenced to 5 years imprisonment.  On April 20, 2011, a grand jury in Minnesota returned an indictment against Vennes for securities fraud and money laundering in connection with the acts alleged in this complaint.  On July 19, 2011, a superseding indictment was filed against Vennes and Fry.

## JURISDICTION AND VENUE

25.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

26.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1331.

27.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a); Section 27 of the Exchange Act [15 U.S.C. § 78aa]; and Section 214 of the Advisers Act [15 U.S.C. §80b-14].

28.     Acts, practices, and courses of business constituting violations alleged in this complaint have occurred within the jurisdiction of the United States District Court for the District of Minnesota and elsewhere.  The Defendants reside in this District.

29.     The Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged in this complaint.

30.     The Defendants will, unless enjoined, continue to engage in the acts, practices, and courses of business set forth in this complaint, and acts, practices, and courses of business of similar purport and object.

## FACTS

### I.    PETTERS RAN A MULTI-BILLION DOLLAR PONZI SCHEME THROUGH THE OFFER AND SALE OF NOTES

31.     Beginning in approximately 1995, Petters began raising money by offering and selling the Notes issued by PCI to members of the public.

32.     Petters offered and sold the Notes to members of the public, including several funds, which, in turn, raised their investment capital from hundreds of private investors located throughout the United States and numerous foreign countries.   The Funds were among the numerous funds to which Petters offered and sold the Notes.

33.     In offering and selling the Notes, Petters represented to investors and potential investors that the proceeds from the sale of the Notes would be used to finance what he described as a purchase order inventory financing operation conducted by PCI.

34.     Petters told investors and potential investors that the purchase order inventory financing operation consisted of transactions in which PCI brokered the sale and delivery of end runs or overstock merchandise, primarily consumer electronics, from manufacturers to certain vendors and then to the Retailers.

35.     Petters represented that the manufacturers demanded payment up front while the Retailers did not pay until the merchandise was delivered.  Petters represented to investors and

potential investors that PCI used investors' money to finance these transactions for the period between when the Retailers placed their orders and when they paid for the merchandise upon delivery.

36.     Petters further represented that these transactions generally took about 90 days to complete, but could, on rare occasions, take longer to complete.  Accordingly, Petters structured the Notes to specify a due date 90 days after the issue date, but also to allow for a maximum maturity date of 182 days after issuance.

37.     Petters represented to investors and potential investors that they would receive high rates of return on the Notes; in the specific case of the Funds, the rate of return on the Notes was 13%.

38.     Petters assured investors and potential investors that the Notes entailed minimal risk because they were secured by the underlying merchandise they financed.

39.     Petters represented that he did business with two companies, Enchanted Family Buying Company ("Enchanted") and Nationwide International Resources Inc. ("Nationwide") (collectively, the "Vendors"), that bought the consumer electronics from manufacturers and then resold the merchandise to the Retailers.

40.     For each transaction, Petters, or others at his direction, provided a series of documents to investors, including a funding request from PCI for the amount of money needed to purchase the underlying merchandise, executed note documents reflecting the investment and guaranteeing a specified rate of return, purported purchase orders from a Retailer, and documents assigning a security interest in the underlying merchandise to the financing investors.

41.     These documents were the only evidence of the purported inventory financing transactions that investors ever saw and, as such, they were meant to provide investors with a level of comfort that the transactions were genuine.

42.     Numerous institutions and individuals invested with PCI in order to obtain the high rates of return Petters promised them on the Notes, together with the safety provided by the security interest in the electronic merchandise underlying each transaction.

43.     As of September 2008, the combined balance sheet for PCI and its affiliates reflected total current liabilities, which included outstanding Notes to approximately twenty institutions and individuals, of over $3.5 billion.

44.     But, in reality, Petters's purported purchase order inventory financing business was a complete sham.

45.     There were no Retailers, "Big Box" or otherwise.

46.     No one ordered any merchandise through PCI.  Petters and others acting at his discretion fabricated all of the underlying documentation – the purchase orders, bills of sales, and assignments of security interests – that they provided to investors to evidence each transaction.

47.     And the two Vendors – Enchanted and Nationwide – were nothing but shell companies with no real operations.

48.     The principals of the Vendors were co-conspirators of Petters.  They knew there were no Retailers and no real orders to buy merchandise.  Each Vendor opened a bank account at Petters's request.  The Vendors served as money conduits for Petters:  they accepted monies wired to them by PCI investors; took a percentage of that money as compensation for their role in the scheme; and then funneled the remainder of the cash to Petters.  The principals of both

Enchanted and Nationwide pleaded guilty in October 2008 to charges of conspiracy to commit money laundering.

49.    The truth is that Petters's operation was nothing but a multi-billion-dollar Ponzi scheme.  Petters raised money from investors and directed the transfer of that money to the Vendors.  Instead of purchasing any merchandise, the Vendors secretly sent most of the investors' money directly to Petters.  Between 2002 and September 2008 approximately $12 billion moved from investors, through the bank account of Enchanted, and then to the account of PCI.  Similarly, over $10 billion was directed to PCI through the bank account of Nationwide.  Petters then, directly and through others, diverted much of that money to his own purposes, while using the rest to pay fictional returns to investors.

50.    When Petters's scheme collapsed in September 2008, investors were left holding $3.5 billion in worthless Notes.

## II.    THE DEFENDANTS OFFERED AND SOLD INTERESTS IN THE FUNDS

51.    Between 1998 and 2008, the Defendants raised approximately $600 million through the sale of interests in the Funds.  The Defendants invested almost all of these monies in Notes issued by PCI.

52.    The Defendants sold interests in the Funds to dozens of investors, including both institutions and individuals.

53.    The monies of persons who invested in the Funds were pooled with monies supplied by the other investors in the Funds.

54.    As represented by the Funds and the Defendants in writing, the investors' profits were to come solely from the efforts of Arrowhead LLC, Blue Point, and Integrated.  Investors were not required to do anything more than to contribute money.

### III.    THE DEFENDANTS' CONTROL OF THE FUNDS

55.    Arrowhead LLC is the General Partner to Arrowhead Partners.  In that capacity, it manages and is responsible for the operation of Arrowhead Partners and its investments. Arrowhead LLC also served as a consultant to Arrowhead Finance.  In that capacity, Arrowhead LLC presented prospective trade finance transactions to Arrowhead Finance's investment manager.  Arrowhead Finance purchased all but two or three Notes out of over 1,000 total Notes that Arrowhead LLC presented to it as investment opportunities.  Additionally, Arrowhead LLC served as an investment advisor and master servicer to Elistone.  In that capacity, Arrowhead LLC presented prospective trade finance transactions to Elistone's investment manager.

56.    Fry exercised absolute control over Arrowhead LLC. Through that entity, Fry and Palm controlled the day-to-day operations of, and directed the investments of, the Funds.  As the Chief Manager of Arrowhead LLC, and as the President of Arrowhead Corp. (Arrowhead LLC's predecessor), Fry was responsible for both firms' operations, including investments made by Arrowhead Partners.  And although the offering materials for Arrowhead Finance identify Blue Point as Arrowhead Finance's investment manager, Fry was the founder, the President, and a Director of Blue Point.  Fry also solicited investments for Arrowhead Finance.  Additionally, the October 27, 1999 and December 21, 2001 confidential private placement memoranda for Arrowhead Finance represent that Fry is primarily responsible for all investment decisions made by Arrowhead Finance's investment manager.  As Arrowhead LLC's Managing Director – Finance, Palm oversaw the day-to-day operations of the Funds.  In 2008, Palm was essentially "second in command" at Arrowhead LLC behind Fry.

57.    Although the offering materials for Elistone identified Integrated as Elistone's investment manager, Arrowhead LLC, in its capacity as the investment advisor and master

servicer to Elistone, effectively managed Elistone's investments in the Notes.   Indeed, Arrowhead LLC presented all prospective trade finance transactions involving the Notes to Integrated and made the same misrepresentations to Integrated that it made to its own investors in Arrowhead Partners.

58.     Arrowhead LLC and Blue Point were investment advisers to the Funds and owed the Funds a fiduciary duty.

59.     Arrowhead LLC, Blue Point, and Integrated charged the Funds fees for their services.  Those fees consisted of a Management Fee and a Performance Fee.  As defined in the confidential private placement memoranda used to solicit investors in the Funds, the Performance Fee was equal to a variable percentage of up to 20% of any profits earned by the Funds.

60.     In total, Fry and Arrowhead LLC took more than $42 million in fees from the Funds. Fry and Palm were paid salaries and other compensation from money contributed by investors in the Funds.

## IV.     DEFENDANTS' SOLICITATIONS OF INVESTORS

61.     From at least as early as 1998 through 2008, the Defendants and the Funds solicited investors for the Funds.

62.     The Defendants created and used various confidential private placement memoranda and pitch books to solicit investments in the Funds.  Those memoranda and pitch books represent that the investment objective of the Funds was to achieve consistent, advantageous rates of return through the purchase of secured notes relating to transaction financing of new, in-the-box, pre-sold, name-brand products.

63.     Fry provided input into, reviewed, and approved the confidential private placement memoranda before they were sent to investors.  Fry also directed an Arrowhead LLC employee in developing and using the pitch books to help tell the story of the Funds to investors.  Fry reviewed each draft of the pitch books and Arrowhead LLC never used any pitch book without his approval.  Fry further approved the body of every pitch book that Arrowhead LLC produced for the Funds and was the source of the bulk of the information included in the pitch books.

64.     For her part, Palm reviewed the pitch books; directed that an Arrowhead Partners pitch book be sent to an Arrowhead Partners investor who, in 2008, wished to establish a fund similar to Elistone; and drafted, customized, and sent an Arrowhead LLC pitch book to that same investor, which represented that the Retailers wired payment directly to the custodial bank.

65.     The Defendants and the Funds described the Funds' primary business as investment in secured notes relating to transaction financing of new, in-the-box, pre-sold, name-brand products.  Among other things, the Defendants sent confidential private placement memoranda and other written information about the Funds to prospective investors, made the Funds' signed account agreements available for review by prospective investors, and talked to prospective investors about the Funds.

66.     The Defendants and the Funds also provided periodic updates to investors regarding the performance of the Funds.  Among other things, those updates provided investors with performance charts and monthly return percentages.

67.     The Funds' confidential private placement memoranda stated that the Funds would purchase Notes only if the Note proceeds would be used to pay the cost of specific,

identified merchandise that one of the Vendors had "pre-sold" to one of the Retailers, as evidenced by one or more purchase orders for the merchandise.

68.     The Funds wired money to the Vendors, which were then supposed to ship the merchandise directly to the Retailers.  The Retailers then were supposed to pay the Funds directly for the merchandise they received.

## V.     MISREPRESENTATIONS TO INVESTORS

### A.     CASH FLOW THROUGH THE COLLATERAL ACCOUNT

69.     In confidential private placement memoranda, in other written materials, and orally, the Defendants and the Funds misrepresented the operation of the Funds' Collateral Accounts to investors and prospective investors.

70.     Among other things, the Defendants and the Funds represented to investors that the Funds and related entities had entered into agreements with Wells Fargo Bank N.A. pursuant to which Collateral Accounts would be established at Wells Fargo Bank N.A.  The Defendants and the Funds represented that the purchase price of each Note would be disbursed from the Collateral Account directly to the Vendor that was selling the merchandise corresponding to each Note.  Then, when payment became due on each Note, the Retailer that had purchased the merchandise would make payments directly to the Collateral Account.

71.     Defendants distributed Arrowhead Partners confidential private placement memoranda, dated July 18, 2001, August 1, 2001, April 11, 2003, and November 1, 2004, to at least five investors and potential investors between 2001 and 2006. These documents specifically state that the principal Note issuer (PCI) has agreed to direct all Retailers to make payments directly to the Arrowhead Partners collateral account.

72.     Defendants distributed Arrowhead Partners pitch books, dated January 2008, February 2008, March 2008, and April 2008, to at least six investors and potential investors in 2008. Defendants also distributed Arrowhead Finance pitch books, dated February 2008, March 2008, and April 2008, to at least five investors and potential investors in 2008. These documents all represented that the Retailers wired payment directly to the custodial bank.

73.     The Defendants also provided investors with opportunities to review contractual agreements for Arrowhead Partners.  Fry signed the July 18, 2001 Arrowhead Partners custodial agreement, which provides that payments from Retailers are sent directly to the Arrowhead Partners Collateral Account.  Fry also signed the July 18, 2001 Arrowhead Partners note purchase agreement, which requires an entity for which he signed to instruct all issuers to "cause all [c]ollections and payments by [Retailers] to be deposited by wire transfer or check directly and only to the [c]ollateral [a]ccount. . . ."

74.     Fry reviewed McGladrey & Pullen LLP's March 21, 2007 Arrowhead Partners audit report for fiscal year 2006 when it was issued.  The management notes to the report represent that the inventory purchaser pays directly to the custodian rather than to the inventory broker.  Arrowhead LLC, the General Partner of Arrowhead Partners, sent that audit report to at least five investors and prospective investors in 2007 and 2008.

75.     The Defendants also provided investors with opportunities to review contractual agreements for Arrowhead Finance.  The April 20, 2007 Arrowhead Finance collateral account control agreement provides that Retailers are to make payment directly to the Collateral Account. The July 18, 2001 Arrowhead Finance Sales and Servicing Agreement includes language indicating that Retailers would be instructed to make payments directly to the Collateral Account.  At least one investor received a copy of the July 18, 2001 agreement.

76.     In early 2008, Fry explained the structure and operation of Arrowhead Partners to one investor and discussed with that investor the creation of a managed account for which Arrowhead LLC would serve as master servicer.  The investor explained to Fry that the investor wished to make a personal investment in Arrowhead Partners and then establish a managed account through the investor's investment firm to invest in Notes and from which to solicit investor funds.  Palm and Arrowhead LLC customized an Arrowhead LLC pitch book for the investor in February 2008, which Palm sent to the investor in February 2008.  The pitch book represented that the Retailers wired payment directly to the custodial bank.  Palm later reviewed a March 2008 marketing piece drafted by the investor's investment firm that was to have been used to market the proposed managed account and which also represented that the Retailers wired payment directly to the Collateral Account.

77.     Fry misrepresented the operation and safety features of Arrowhead Partners orally to at least one investor in 2004.  While soliciting an investment from and serving as the due diligence contact for that investor in 2004, Fry represented that the Retailers made all payments directly into the Funds' Collateral Account, and not to Arrowhead LLC or Petters.  The investor subsequently invested approximately $6 million in Arrowhead Partners.  Neither Defendants nor Arrowhead Partners ever informed the investor that the funds were not flowing as represented.

78.     The February 26, 2008 collateral account agreement for Elistone provides that Retailers are to make payments directly to the Collateral Account.  Palm worked on the agreement and was familiar with the substance of the agreement.

79.     In 2007, Palm directed an Arrowhead LLC employee to send a pitch book, likely the then-current Arrowhead Finance pitch book, to Integrated.  That pitch book, which was sent to Integrated, represented that Retailers made payments directly to the Collateral Account.  Palm

later edited Integrated's June 2008 Elistone pitch book.   The June 2008 pitch book also represents that Retailers wired payment to the custodial bank.

80.     In reality, however, the Collateral Accounts did not function as the Defendants and the Funds represented they would.   The Defendants – who received and reviewed bank statements for the Collateral Accounts – knew that the money that was paid into the Collateral Accounts never came from any Retailers and, instead, always came directly from PCI.   This was a critical problem.   Since the payments never came from Retailers, the Defendants could not verify that there were actually any transactions between the Vendors and the Retailers.

81.     The fact that the payments came from PCI and not the Retailers wholly contradicted the representations that the Defendants and the Funds made orally, and in confidential private placement memoranda, pitch books, account agreements, audit reports, and other communications to investors and potential investors.   The Defendants (and, through Defendants, the entities they worked for) knew these representations were false when they were made.

82.     Nevertheless, from at least as early as 2001 through 2008 the Defendants and the Funds concealed the truth about cash flow through the Collateral Accounts.   Throughout that period, the Defendants and the Funds continued to represent to investors and prospective investors that the payments that were deposited into the Collateral Accounts came directly from the Retailers.

**B.**     MANAGEMENT COMPANY'S REGISTRATION STATUS WITH THE COMMISSION

83.     Fry, Arrowhead LLC, and Arrowhead Finance falsely represented to investors and potential investors that Arrowhead Corp. and, later, Arrowhead LLC were registered with the Commission as investment advisers.

84.     While Arrowhead Corp. did register with the Commission as an investment adviser on November 27, 1995, it terminated its registration on July 7, 1997 before any investor money was placed in any of the Funds.   Arrowhead LLC was never registered with the Commission in any capacity.

85.     The false representations about Arrowhead Corp.'s and Arrowhead LLC's registration status appear in the sections of Arrowhead Finance's confidential private placement memoranda that set forth Fry's biographical information, which Fry reviewed and approved before sending to investors or potential investors.

86.     The October 27, 1999, October 2, 2000, and December 21, 2001 Arrowhead Finance confidential private placement memoranda all represent that Arrowhead Corp. was registered with the Commission.   At least one investor or potential investor received a copy of the December 21, 2001 memorandum in 2001, with Fry's knowledge and approval. Additionally, the March 17, 2003, December 17, 2003, August 1, 2004, and March 4, 2005 Arrowhead Finance confidential private placement memoranda all represent that Arrowhead LLC was registered with the Commission.   The Defendants sent at least three investors or potential investors copies of the memoranda in 2003-2007.

87.     Fry and Arrowhead LLC (and, through them, the entities they worked for) knew these representations about Arrowhead LLC's and Arrowhead Corp.'s registration status with the Commission were false. Neither they nor Arrowhead Finance ever told investors and potential investors that Arrowhead LLC did not register with the Commission or that Arrowhead Corp. terminated its registration.

### C.   QUARTERLY EXAMINATIONS OF TRANSACTION PROCEDURES

88.   The Defendants and the Funds represented to investors and potential investors that independent accountants completed quarterly examinations of the Funds' transaction procedures.

89.   The January 2008, February 2008, March 2008, and April 2008 Arrowhead Partners pitch books that were distributed by Defendants and Arrowhead Partners to at least six investors and potential investors in 2008, and the February 2008, March 2008, and April 2008 Arrowhead Finance pitch books that were distributed by Defendants and Arrowhead Finance to at least five investors and potential investors in 2008, all represent that independent accountants conducted quarterly examinations of the Funds' transaction procedures.  No such examinations were conducted during the period in which the pitch books were distributed.

90.   The June 2008 Integrated pitch book for Elistone similarly represented that independent accountants conducted quarterly examinations of Elistone's transaction procedures. No such examinations were conducted with respect to Elistone.

91.   Defendants and the Funds never informed the investors and potential investors that the examinations were never performed even though Defendants (and, through Defendants, the entities they worked for) knew that the examinations never occurred.

### D.   VENNES'S CRIMINAL RECORDS

92.   Defendants Fry and Arrowhead LLC (as well as Arrowhead Partners and Arrowhead Finance) hid from investors Vennes's criminal record, including his conviction for money laundering.

93.   The Arrowhead Partners and Arrowhead Finance pitch books represented that the funds engaged in rigorous due diligence and employed a robust risk management structure.

94.     Vennes introduced Fry to the Notes and ultimately played a key role in Arrowhead LLC's business with the Petters.  When Fry began doing business with Petters, Vennes held himself out as Petters's exclusive service agent and controlled the flow of information between Petters and Arrowhead LLC, requiring all communications between Fry and Petters to go through him.  Vennes was heavily involved in the Notes purchased by Arrowhead Partners and Arrowhead Finance, including advising Arrowhead LLC with respect to why and when the Notes were being paid.

95.     Fry knew about Vennes's 1987 criminal conviction at least as early as 2001.  Fry talked to Vennes about and was concerned about Vennes's criminal record.

96.     Despite Vennes's significant role in the Arrowhead Partners and Arrowhead Finance Notes and the representations in the pitch books relating to Arrowhead Partners's and Arrowhead Finance's due diligence and risk management, and despite the fact that Vennes controlled the flow of information between Petters and Arrowhead LLC, neither Fry, nor Arrowhead LLC, nor Arrowhead Partners, nor Arrowhead Finance disclosed Vennes's criminal record to investors or potential investors.

E.      SLOW PAYMENTS AND NOTE MATURITY DATE EXTENSIONS

97.     When Petters began to experience serious cash flow problems and was not making timely payments on the Notes, the Defendants (as well as Arrowhead Partners and Arrowhead Finance) concealed this fact from investors and potential investors, even as Defendants became concerned that the Notes might not be repaid. Defendants (and Arrowhead Partners and Arrowhead Finance) also agreed to extend the maturity dates on some of the Notes to keep investors from discovering the slow payments.

98.     Before late 2007, the Notes that Arrowhead Finance and Arrowhead Partners purchased typically had been repaid approximately 90 days after the funding date, consistent with the description of those Notes as 90-day notes in the confidential private placement memoranda and pitch books provided to investors and potential investors.  Arrowhead Finance's and Arrowhead Partners's January 2008, February 2008, March 2008, and April 2008 pitch books referred to the Notes as 90-day notes; some also included data on the average note maturity of the funds' portfolios, which indicated that, on average, the Notes paid approximately 90 days from the dates that they funded.  While all of the Notes did not pay off precisely on the 90th day, the funds generally received payments on their Notes within a normal range of 85 to 110 days.

99.     In late 2007, Petters began to have difficulties obtaining enough cash from new investments to make timely payments on outstanding Notes.  As a result, by November 2007, Arrowhead Finance and Arrowhead Partners held at least 12 Notes that remained unpaid more than 100 days after they were funded.

100.     Holding a dozen Notes that were still outstanding 100 days after funding was unusual for Arrowhead Finance and Arrowhead Partners, so Palm and Arrowhead LLC reached out to Vennes for an explanation.  Vennes told Palm that the delinquencies were attributable, at least in part, to a shortage of trucks available to deliver the merchandise financed by the Notes.  Vennes further explained to Palm that "slotting" – the Retailers' practice of accepting merchandise in small, sequential groups to delay triggering the obligation to pay, which arose only once all of the merchandise had been delivered – was also contributing to the delays.

101.     By December 2007, with Arrowhead Partners and Arrowhead Finance holding a group of Notes that remained unpaid more than 120 days after they were funded, Defendants had

become concerned that the Notes might not pay off thereafter.  As of January 31, 2008, when those Notes remained unpaid, the magnitude of that concern increased.  Fry, therefore, instructed Palm to speak daily about the late Notes with Vennes.

102.    By February 2008, Fry and Palm had both become concerned that the Notes might not be repaid.  At that point in time, certain of the late Notes were not merely beyond their 90-day due dates, but were nearing their full, 182-day maturity dates, after which nonpayment would result in default.

103.    By February 2008, Palm had become concerned that Vennes had been dishonest with Arrowhead LLC about the reasons for the payment delays and about certain reserves Vennes had suggested that Petters intended to use as a source of funds for Note payments in the event that payments from the Retailers did not arrive before the Notes defaulted.  Palm was also concerned, at that time, about whether other hedge funds were encountering similar payment delays and, if so, whether Petters would have sufficient capital – whether from the purported reserves or elsewhere – to redeem all of the outstanding Notes, if necessary.

104.    The ongoing trucking shortage and slotting issues rose to the level of great concern by no later than May 2008.  By early June 2008, Palm was in a state of high alert with respect to whether late Notes would ever pay.

105.    Despite their significant concerns that the Notes held by Arrowhead Partners and Arrowhead Finance might not be repaid, neither the Defendants, nor Arrowhead Partners, nor Arrowhead Finance informed investors or potential investors that Notes were trending far beyond the normal 90-day repayment range or that the Notes were approaching default.

106.    Arrowhead Partners, Arrowhead Finance, and Defendants continued to send pitch books to potential investors in 2008 that described the Notes as 90-day notes.  On May 15, 2008,

24

Arrowhead LLC sent an Arrowhead Finance pitch book dated March 2008 to a potential investor.  That pitch book omitted information, which had been included in other Arrowhead Finance pitch books, regarding the average maturity of Arrowhead Finance's Notes.  The pitch book still represented that the Notes were 90-day notes.  The average note maturity data, however, was ultimately removed from investor performance summaries at Fry's direction because the average was creeping up over 100 days.

107.    To hide the fact that certain of the Notes were paying late, the Defendants, Arrowhead Finance, and Arrowhead Partners ultimately decided to extend the maturity dates of those Notes.  Notes were extended during the period February 2008 to May 2008.  Arrowhead Finance's and Arrowhead Partners's Notes defaulted if not paid in full within 182 days after the dates they were funded.  Even though the late Notes would have been in default without the extensions, the Defendants, Arrowhead Partners, and Arrowhead Finance never informed investors and potential investors that the maturity dates on Arrowhead Finance and Arrowhead Partners Notes were extended in 2008.

108.    Fry and Palm knew that the Notes' maturity dates were extended and Fry was involved in the decision to extend the maturity dates beginning in February 2008.  Fry signed the agreement to extend the maturity date for Arrowhead Partners Note 2277 himself.  In addition to Arrowhead Partners Note 2277, the maturity dates for Arrowhead Finance Notes 7050, 7056, 7058, 7061, 7062, 7064, 7065, 7066, 7067, 7068, and 7069 were also extended.  Fry and Palm knew of and approved the extensions of the maturity dates for the Notes.  The Defendants, Arrowhead Partners, and Arrowhead Finance never informed investors or potential investors that maturity dates for these Notes were extended.

## VI.     THE PONZI SCHEME COLLAPSES

109.     On September 24, 2008, federal agents from the FBI, the criminal division of the IRS, and the U.S. Postal Inspectors executed search warrants at the corporate headquarters of Petters Group, the offices of PCI, and the homes of several top company executives, including Petters, and seized hundreds of thousands of documents.

110.     On October 3, 2008, Petters was arrested and the USAO filed charges against Petters for mail fraud, wire fraud, money laundering, and obstruction of justice.

### COUNT I

VIOLATIONS OF SECTION 17(A) OF THE SECURITIES ACT
(AGAINST ALL DEFENDANTS)

111.     Paragraphs 1 through 110 are alleged and incorporated by reference as though fully set forth herein.

112.     By engaging in the conduct described above, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have, among other things, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

113.     By reason of the foregoing conduct alleged above, Defendants violated Section 17(a) of the Securities Act.

**COUNT II**

**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
AND RULE 10b-5 THEREUNDER
(AGAINST JAMES N. FRY)**

114.    Paragraphs 1 through 110 are alleged and incorporated by reference as though fully set forth herein.

115.    As more fully described in paragraphs 1 through 110 above, Fry, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly, has, among other things, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

116.    Fry acted with scienter.

117.    By reason of the foregoing conduct alleged above, Fry violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**COUNT III**

**AIDING AND ABETTING ARROWHEAD PARTNERS'S VIOLATIONS OF SECTION
10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER
(AGAINST ALL DEFENDANTS)**

118.    Paragraphs 1 through 110 are alleged and incorporated by reference as though fully set forth herein.

119.    As more fully described in paragraphs 1 through 110 above, Arrowhead Partners, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly, has, among other things, made untrue statements of material fact and omitted to state material facts

27

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

120.    By reason of the foregoing, Arrowhead Partners violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

121.    Arrowhead Partners acted with scienter.

122.    The Defendants knowingly provided substantial assistance to Arrowhead Partners in connection with the violations described in Paragraphs 1 through 121 above.

123.    By reason of the foregoing, the Defendants aided and abetted Arrowhead Partners's violations of Section 10(b) of the Exchange and Rule 10b-5 thereunder.

### COUNT IV

VIOLATIONS OF ADVISERS ACT
SECTION 206(4) AND RULE 206(4)-8 THEREUNDER
(AGAINST ARROWHEAD CAPITAL MANAGEMENT LLC)

124.    Paragraphs 1 through 110 are alleged and incorporated by reference as though fully set forth herein.

125.    The Funds are pooled investment vehicles pursuant to the Advisers Act and the rules and regulations promulgated thereunder.

126.    At all times relevant to this complaint, Arrowhead LLC acted as an investment adviser as defined under the Advisers Act.   Arrowhead LLC managed the investments of Arrowhead Partners in exchange for compensation in the form of performance and management fees.

127.    As more fully described in paragraphs 1 through 110 and 125 and 126 above, at all times alleged in this complaint, Arrowhead LLC, while acting as an investment adviser, violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.R.

§ 275.206(4)-8] thereunder, including by using the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, to make untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in a pooled investment vehicle.

## COUNT V

### AIDING AND ABETTING VIOLATIONS OF ADVISERS ACT SECTION 206(4) AND RULE 206(4)-8 THEREUNDER
### (AGAINST JAMES N. FRY AND MICHELLE W. PALM)

128.    Paragraphs 1 through 110 are alleged and incorporated by reference as though fully set forth herein.

129.    The Funds are pooled investment vehicles pursuant to the Advisers Act and the rules and regulations promulgated thereunder.

130.    At all times relevant to this complaint, Arrowhead LLC acted as an investment adviser as defined under the Advisers Act.

131.    As more fully described in paragraphs 1 through 110 and 125 through 127 above, at all times alleged in this complaint, Arrowhead LLC, while acting as an investment adviser, violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder, including by using the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, to make untrue statements of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to an investor or prospective investor in a pooled investment vehicle.

132.    Fry and Palm knowingly provided substantial assistance to Arrowhead LLC in connection with the violations described in Paragraphs 1 through 110 and 125 through 131.

133.    By reason of the foregoing, Fry and Palm aided and abetted Arrowhead LLC's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

## I.

Find that the Defendants committed the violations charged in this complaint.

## II.

Enter an order of permanent injunction as to the Defendants, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, enjoining the Defendants, and their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of the order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices, or courses of business described above, or in conduct of similar purport and object, that violate, or aid and abet violations of, the provisions of law and rules alleged in this complaint.

## III.

Enter an order requiring the Defendants to disgorge all ill-gotten gains, including prejudgment interest, they received as a result of the violations charged in this complaint.

## IV.

Enter an order imposing upon the Defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that are entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further equitable relief as this Court deems appropriate and necessary.

Dated: November 9, 2011                              Respectfully submitted,

                                                                    **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

                                                   s/ Daniel J. Hayes
                                                  By:     One of its Attorneys

Daniel J. Hayes, Esq. (IL 6243089)
Michael D. Wells, Esq. (IL 6276155)
Andrew P. O'Brien, Esq. (IL 6280729)
**United States Securities and Exchange Commission**
175 West Jackson Boulevard
Ninth Floor
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:  (312) 353-7398

**Serving as Local Counsel:**

James Alexander
**United States Attorney's Office for the District of Minnesota**
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, Minnesota
Telephone:  (612) 664-5600
Facsimile:  (612) 664-5787